## WILLCOX v. JACKSON.

1. **Evidence**: RESPECTING TRANSACTIONS WITH DECEASED PERSON. In an action by the wife upon a promissory note, whose execution to her, as payee, was procured by the husband, since deceased, the testimony of the defendant as to what occurred between him and the deceased at the time the note was executed is incompetent.

2. ———: DRUNKENNESS. To defeat a contract on the ground of drunkenness the intoxication must have been so excessive as to deprive the party of the use of his reason and understanding.

3. ———: ———. Where a party procures the intoxication of another for the purpose of securing an unconscionable advantage in a contract, the contract will be held void in an action to enforce it.

*Appeal from Monroe Circuit Court.*

WEDNESDAY, JUNE 4.

THIS is an action upon a promissory note, made by the defendant, N. P. Jackson, and for the foreclosure of a mortgage executed to secure the same. The note is dated April 22, 1873, and is as follows:

"Four years after date I promise to pay Sarah J. Willcox, or bearer, six thousand and eighty-eight dollars and seventy cents, for value received of her, bearing ten per cent interest from date. This note draws but ten per cent interest annually, and no usury contained in the same."

The defendant, N. P. Jackson, for answer, alleges in substance that the note is usurious; that it was given without any consideration, and that it was fraudulently procured from him on settlement by means of making him intoxicated, when, in fact, he did not owe the plaintiff anything. The cause was tried by the court upon written evidence. The court found that the note sued upon was procured by fraud, but that the mortgage given at the same time was not fraudulent so as to affect the right of the plaintiff to have judgment for whatever amount was actually due on the 22d of April,

Willcox v. Jackson.

1873—which amount the court found to be nineteen hundred dollars. Judgment was rendered against the defendant, N. P. Jackson, for nineteen hundred dollars, with ten per cent interest per annum from April 22, 1873, amounting to two thousand eight hundred and twenty-seven dollars and thirty cents, and the mortgage was foreclosed. Both parties appeal.

*Dashiell & Andrews*, for plaintiff,

*Perry & Townsend*, for defendant.

DAY, J.—I. Certain questions as to the competency of evidence lie at the threshold of the case and must be first considered.

1. The note in question was given upon a settlement of certain dealings which the defendant, N. P. Jackson, had with 1. EVIDENCE: Jeremiah Willcox, the husband of the plaintiff, respecting transactions who died before this action was commenced. The with deceased person. settlement was made with Jeremiah Willcox, and the note sued on was executed to the plaintiff without any consideration in fact moving from her. The defendant testified respecting what occurred at the time of the settlement, and also as to certain payments before that time made to Jeremiah Willcox. The plaintiff objected to the competency of this evidence under section 3639 of the Code. The court excluded all evidence of the defendant as to personal transactions between himself and the deceased. This ruling of the court, we think, was clearly correct.

2. The defendant introduced evidence of various declarations and admissions of Jeremiah Willcox after the execution of the note and mortgage as to the amount of the defendant's indebtedness. The plaintiff objected to this evidence, and the objection was overruled. The plaintiff insists that the taking of the note in the name of Sarah J. Willcox was an assignment of the claim to her, and that an admission of the assignor, subsequent to the assignment, is not admissible

against the assignee, citing 1 Greenleaf on Evidence, § 190. The evidence shows, however, that the whole consideration for the note moved from Jeremiah Willcox. The plaintiff was not present when the note was executed, and the taking of it in her name appeared from the evidence to have been a mere voluntary act upon the part of her husband. Notwithstanding the form of the note Jeremiah Willcox seems to have continued to be the party beneficially interested. Under the circumstances we think his declarations were properly admitted.

II. The defendant insists that the note and mortgage were fraudulently obtained from him while he was in a state

2. ——: drunk-
enness.

of intoxication. The law upon the subject of avoiding contracts on the ground of drunkenness is declared in Story's Equity Jurisprudence, § 231, as follows: "But to set aside any act or contract on account of drunkenness it is not sufficient that the party is under undue excitement from liquor. It must arise to that degree which may be called excessive drunkenness, where the party is utterly deprived of the use of his reason and understanding. *  *  *  *  If there be not that degree of excessive drunkenness, then courts of equity will not interfere at all, unless there has been some contrivance or management to draw the party into drink, or some unfair advantage taken of his intoxication, to obtain an unreasonable bargain or benefit from him. For, in general, courts of equity, as a matter of public policy, do not incline on the one hand to lend their assistance to a person who has obtained an agreement or deed from another in a state of intoxication; and, on the other hand, they are equally unwilling to assist the intoxicated party to get rid of his agreement or deed merely on the ground of his intoxication at the time. They will leave the parties to their ordinary remedies at law, unless there is some fraudulent contrivance or some imposition practiced." In *Mansfield v. Watson*, 2 Iowa, 111, the law is declared in about the same terms. While the evidence shows that the defendant drank to a considerable extent during the time that the settlement was in progress, yet we

cannot find from the evidence that his intoxication was of such excessive character as will, under the authorities above cited, authorize the setting aside of his contract on the ground of drunkenness alone.

III.   The defendant further insists, however, that his intoxication was brought about by the contrivance and management of Jeremiah Willcox, for the purpose of obtaining an undue advantage of him, and that, under such circumstances, a less degree of drunkenness than as above set forth is sufficient to avoid a contract.

R. A. Hewitt, who was in the employment of Jeremiah Willcox, and assisted in making the settlement, among other things testified as follows : "Jackson came there the same day the note sued on was got up—about the time the business transaction between him and Willcox was counted up.   I had told him Willcox wanted him to come over to make a settlement, and also spoke to him that Willcox wanted a mortgage.   He came there in the afternoon.   I can't remember exactly the time of day, but to the best of my recollection it was in the afternoon before the settlement was made—in the night.   When he came there Willcox was friendly as usual, and treated and talked something in regard to the settlement.   We all drank several times.   Willcox told him not to go away.   Jackson was going somewhere in the neighborhood to get some seed oats, but he concluded to stay there and settle, and he stayed there all night.   Along sometime in the evening—I don't remember whether it was before dark or after dark—the settlement began.   *   *   *   *   *   *   I think Jackson and Willcox and myself was all that was there.   He got out the notes and went to making calculations.   I was calculating the interest on the notes, and Jackson soon commenced getting seemingly discouraged, from the conversation.   He said certainly he didn't owe so much.   Willcox was standing at the table.   Every once in a while he drew out another note, and Jackson seemed to get surprised.   He was astonished.   He said, 'My God! when did I ever give these notes?'   Willcox

told him at such a time he got so much money.    Jackson said,
'There is a great many more than I had any idea of, although
I didn't know how many he had against me,' till finally Jack-
son got mad and said he would go home.    We chatted with
him awhile and took something more to drink.    I went ahead
and figured upon the notes and mortgage, and they all figured
up to the amount made out.    *    *    *    *    *    *    *    *    *
We all drank several times.    I think, from the time he came
there until we went to bed, Jackson, Willcox and myself had
drank the best part of two or three bitter bottles of whisky.
We drank about three pints of whisky.    It was about the mid-
dle of the afternoon or later when we commenced, and I think
it was about 12 o'clock when I went home.    I left Jackson
and Willcox in the store.    He had whisky in. the back room.
I got back there tolerably early the next morning and Willcox
was there in the store.    Jackson came in pretty early after I
got there.    I don't know where he was.    Willcox said, when I
was  leaving there, 'I want you to come back and fix this
thing up.'    I expected to come there and make a fire, but I
found there was a fire there when I got there.    He said, 'Jack-
son will be in.    If he wants anything to drink,' he said, 'you
and him drink all you want, and tell him he must give me
more land to secure me.'    I think Jackson had left out one
hundred and twenty acres or one hundred and sixty acres.
Now, if I am not mistaken, he gave him eighty acres more
than they talked about.    My recollection is he added eighty
acres next morning.    Willcox didn't say, to my knowledge,
what his object was to get him to drink so much.    He didn't
tell me how often to give him liquor.    Jackson and me went
into the back room and took a dram apiece.    I knew Jackson
was the worse, and told him I would rather be knocked down
than to ask him to give more land.    He said, 'You are doing
my business.    Go in and do it,' and I spoke to Jackson.    He
said the land was worth more than he had against it.    We
talked a while and then took something to drink, and I told
him Mr. Willcox wanted him to give more land, and he didn't

seem to like to do it. I told him that was the way Willcox wanted it, and we took something more to drink and then went back and fixed it up. Jackson agreed to do it. Swan came pretty soon in the morning. I don't think he was there when Jackson and I went into the back room. He came there to make this mortgage. I had written the note. Jackson signed the note that night is my recollection. I think it was some time after he signed the note that I went home, and I was to come up in the morning and see to having the mortgage made out. I am satisfied that Jackson felt his liquor in the evening pretty strong. In the morning, when I went up there, I didn't know what was the matter with him; whether he was drunk or half crazy. I couldn't tell you how he did act. I thought the man was mad. I didn't know whether it was trouble about the affair, or whether he was half drunk, or what it was."

It very clearly appears from the evidence that the sum of one hundred and seventy-nine dollars and thirty-four cents, for which a note had been given, was included in an open account, and was thus charged to the defendant twice. The defendant is illiterate. He executed the note sued on by making his mark. It was proved that Jeremiah Willcox, upon several occasions, both shortly before and after the settlement in question, admitted to various persons that the defendant owed him but little, if anything at all.

One Samuel Bowlix testified as follows: "I remember going with Willcox to Jackson's, sometime in the summer of 1873, to get some stock. We went in a buggy. We saw Jackson. Willcox wanted to buy Jackson's cattle. Jackson says, 'I don't believe I will let you have them,' and Willcox wanted to know why. He said, 'You want to credit them on the mortgage and note; I don't want the credit on them till that is fixed in a different shape from what it is.' Willcox said, 'Let me have the cattle and we will fix that up satisfactory at any time you want to.' 'No,' said Jackson, 'I won't let you have the cattle,' and he didn't get them at that time.

Jackson said he didn't think it was altogether just, and Willcox said he thought it was. Willcox said he would fix it all right at any time. He said he would make it right before it came due or after it came due. Then Jackson told him still he could not have the cattle. Willcox and I came home from there, and on the way said he did not blame Jackson for not wanting to let the cattle go on that mortgage. He said if Jackson had the education he had, and held the mortgage as he did, he would consider it worth very little to him now. That is just what he said to me."

We have set out but a small portion of the evidence, and yet we have alluded to the principal part of the competent evidence immediately connected with the settlement. The whole evidence impresses upon us the conviction that Jeremiah Willcox procured the intoxication of the defendant for the purpose of procuring an unconscionable advantage in the settlement; that the note was fraudulently obtained for an amount too large, and that both it and the mortgage should be avoided for fraud.

IV. Having found both the note and mortgage fraudulent, it is, perhaps, not necessary to pursue the investigation of this case any further. The court below found that the mortgage was valid so far as the amount actually due is concerned, and found that amount to be, at the time of the settlement, one thousand nine hundred dollars. The evidence, we think, does not furnish any satisfactory basis for finding this amount to be due. The parties made a settlement sometime in 1868, at which time the defendant gave his note to Jeremiah Willcox for two thousand dollars. This note entered into the settlement at which the note in question was given. Hewitt testified that there was due on this note, at the time of the settlement, about one thousand nine hundred dollars. This testimony evidently furnishes the basis of the decree below, but this basis is to our minds entirely unsatisfactory. Hewitt testified simply as to the amount which appeared upon the face of the note to be due, allowing for the credits indorsed

upon it. Several other notes entered into this settlement, as well as several payments made by the defendant. These all seem to have been ignored. The evidence furnishes no *data* for determining with anything like accuracy the amount due from the defendant to the plaintiff. This action is brought upon a note and mortgage. They both, as we have seen, should be held void for fraud. That ends the inquiry under the issues in this case. The plaintiff must be left in the appropriate action to seek recovery for the amount really due. On the defendant's appeal the judgment is

REVERSED.